# In the

# United States Court of Appeals

## For the Seventh Circuit

───────────

No. 03-4076

JOANNE BARNETT,

*Plaintiff-Appellant,*

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

*Defendant-Appellee.*

───────────

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 4:03-CV-14-AS—**Allen Sharp**, *Judge.*

───────────

ARGUED AUGUST 3, 2004—DECIDED AUGUST 25, 2004

───────────

Before POSNER, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Joanne Barnett suffers from non-convulsive epileptic seizures and seeks disability insurance benefits under 42 U.S.C. § 423(a)(1). An administrative law judge (ALJ) concluded that her condition is not severe enough to be presumptively disabling, and that even with the condition, she is not disabled because she can still perform a substantial number of jobs in the local economy. The Appeals Council denied review, rendering the ALJ's decision the final decision of the Commissioner of Social

Security. 20 C.F.R. § 404.981. Barnett then sought review in the district court, 42 U.S.C. § 405(g), without success. Because we conclude that the ALJ made significant errors in finding that Barnett is not presumptively disabled, we reverse the judgment of the district court and remand for further proceedings.

## I.  BACKGROUND

Barnett began experiencing seizures after the birth of her son over thirty-five years ago. For years the seizures were sporadic and minor, and they did not stop Barnett from owning a restaurant with her husband, Jack, where she cooked and performed administrative tasks. But over time Barnett's seizures became more frequent, ultimately forcing the couple to sell their restaurant in May 2000 after fifteen years. Barnett applied for disability benefits the following year, alleging an onset date of May 2000. However, in August 2001, a few months after Barnett filed, she and her husband resumed ownership of the restaurant when the sale fell through, and Barnett is working there again about four hours a week.

Barnett sought long-term treatment primarily from her family physician, Dr. Francis O'Brien. Throughout the early 1990s, Dr. O'Brien prescribed anti-seizure medications, but still Barnett experienced seizures with increasing, though ir-regular, frequency. Medical records show that in early 1993 the seizures might be separated by weeks, but over the following three years the frequency had jumped to where Barnett reportedly suffered three a month on average and occasionally four or five in a single day. Increasing the dos-age of her medications provided only temporary relief, so in July 1999 Barnett consulted a neurologist, Dr. Richard Cristea. Dr. Cristea ordered tests including an MRI and con-firmed Dr. O'Brien's diagnosis of epilepsy. He then adjusted Barnett's medications, yet the number of seizures increased

during late 1999 to a reported average of four or five a month. The following year was better, and in June 2000 Barnett reported to Dr. O'Brien that she went an entire month without a seizure and that she was "having less seizures than ever before." At her next annual examination in June 2001—after she had applied for disability benefits— Barnett told her new treating physician, Dr. Marianne Plascak (who is also Dr. O'Brien's daughter), that she sometimes has seizures every day but had recently gone a week without one. Barnett returned to Dr. Plascak in October 2001, reporting that she had suffered three seizures in eleven days.

The Indiana Department of Family and Social Services consulted three doctors regarding Barnett's application for benefits. Dr. Robert Kaye wrote after an August 2001 examination that Barnett reported having a seizure about every two weeks and that her seizures were "not followed by any long episodes of lack of concentration." He opined that Barnett's seizures were "not terribly out of control" but rendered no opinion regarding their severity. In September 2001 Dr. A. Dobson completed a Physical Residual Functional Capacity Report ("RFC") after reviewing Barnett's medical records. In the RFC, Dr. Dobson opined that Barnett had no exertional limitations as a consequence of her seizures but should avoid all exposure to hazards such as machinery and heights. Dr. J. Sands reviewed Barnett's medical records and agreed with Dr. Dobson's RFC findings.

In contrast to these consultants' opinions, Dr. Plascak submitted two opinion letters for the ALJ to consider. In a January 2002 letter, Dr. Plascak opined that Barnett was totally disabled by her seizures: "Joanne Barnett has a long history of seizure disorder. More recently she is having recurrent uncontrolled absence seizures. This condition renders her totally disabled. She is not able to be gainfully employed at any job." In an August 2002 letter, Dr. Plascak also disagreed with statements in Dr. Kaye's report about Barnett's recurrent seizures:

> Joanne Barnett has a known diagnosis of epilepsy. She states that the related seizures are more frequent when she is overtired. Seizures are two to three minutes in duration. The after effects of a seizure include blackouts, numb lips, inability to speak, in addition to impaired thought concentration. After these seizures the patient sleeps for approximately four hours.

At her disability hearing in September 2002, Barnett described the frequency and nature of her seizures. Barnett explained that as of the date of the hearing she sometimes had seizures two to three times a day and on average eight to nine times a week. According to Barnett, the seizures come with no real warning; if she senses the onset, though, she will try to move to the restaurant's office. She testified that during the seizures, which last two to three minutes, she will black out, feel her mouth go numb, and not be able to speak. Afterwards she cannot concentrate for three to four hours and usually sleeps. Although she worked in the restaurant's kitchen around knives and stoves and occasionally drove a car, she acknowledged that she had never been injured because of her seizures.

Jack Barnett also testified at his wife's disability hearing, confirming that she might have two to three seizures a day and eight to ten a week, and that the frequency was increasing. Jack added that his wife "can't talk, she can't move, she can't do anything" during a seizure. He used one of Barnett's recent seizures as an example:

> [S]he'll be sitting in the car, and then all of a sudden, she'll say something, and I'll look at her, and then she can't talk no more, that's it. I mean, her mouth, then she starts feeling of her mouth, and her mouth gets numb, and so I don't say nothing to her, just for a little while. And then after it's over with, I ask her if she's all right.

When asked if Barnett lost consciousness during a seizure, Jack responded that he did not know, but added that Barnett will fall down if she is standing when a seizure occurs.

Applying the standard five-step analysis, *see* 20 C.F.R. § 416.920(a)(4), the ALJ concluded that Barnett is not disabled. At step one, he "reserved" deciding whether Barnett was engaging in substantial gainful activity given that she had resumed working at her restaurant. The ALJ found at step two that Barnett suffers from a severe seizure disorder. At step three, however, the ALJ concluded that Barnett's disorder does not meet or equal any listed impairment because, according to the ALJ, Barnett's seizures are too infrequent to satisfy the listing criterion for nonconvulsive epilepsy that seizures occur at least once weekly. The ALJ discredited Barnett's account of more frequent seizures because, according to the ALJ, her hearing testimony was inconsistent with her work history and activities, and with her earlier descriptions to her treating doctors of the seizures, their side effects, and their frequency. The ALJ also found Jack Barnett not credible because his testimony simply "reiterated" Barnett's testimony. And the ALJ discounted Dr. Plascak's opinion that Barnett is totally disabled because the opinion rests on Barnett's "description of her seizures and their effects and is inconsistent with the medical evidence in the record." The ALJ found at step four that Barnett cannot perform her past restaurant work, but can hold a job that does not entail climbing to unprotected heights, proximity to machinery, or driving. Finally, at step five, the ALJ relied on a vocational expert's testimony in concluding that Barnett could work as a cashier, clerk, or messenger—of which there are a substantial number of positions in Indiana.

## II. ANALYSIS

We will uphold an ALJ's decision as long as the ALJ applied the correct legal standard, and substantial evidence supports the decision. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (internal quotation marks and citation omitted). On appeal Barnett challenges the ALJ's determination that her seizures do not occur at least one time per week on average. If the ALJ had credited Barnett's testimony that she currently suffers sometimes two to three seizures a day and on average eight to nine a week, the ALJ would have found her presumptively disabled at step three.

Under a theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. § 404.1525(a). A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* § 404.1526(a). In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2003); *Steele*, 290 F.3d at 940. The ALJ never identified by name the listing relevant to Barnett's disability claim. But, giving the ALJ the benefit of the doubt, we infer from his written decision that he correctly recognized the applicability of Listing 11.03. That listing applies to "nonconvulsive epilepsy," which must be documented by a "detailed description of a typical seizure pattern, including all associated phenomena." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.03. Seizures must occur "more frequently than once weekly" despite prescribed treatment, and with "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." *Id.*

The ALJ's first mistake in evaluating whether Barnett's impairment meets or equals Listing 11.03 was his refusal to give careful consideration to the medical records predating her May 2000 abandonment of full-time employment. Having a job is not necessarily inconsistent with a claim of disability; the claimant "may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003); *see Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998). Barnett's medical records, going back more than ten years before she ever filed an application for benefits, document that she suffers from nonconvulsive epilepsy, as confirmed by the MRI in 1999 that revealed a loss of brain cells in the hippocampus as often seen in individuals with temporal lobe epilepsy. While it may be true that these records do not establish an average of one seizure per week over the entire course of treatment, they do establish an upward trend in the frequency and severity of Barnett's seizures. Beginning in 1999 a pattern emerged where Barnett's seizures become more frequent and adjustments to her medications only temporarily controlled the upsurge; the seizures then become more frequent again, leading to further adjustments in her medications.

The ALJ also mistakenly disregarded Dr. Plascak's opinion that Barnett suffers from recurrent seizures and is disabled; the ALJ reasoned that Dr. Plascak's opinion is inconsistent with the medical record, but this conclusion is but another reflection of the ALJ's unwillingness to give effect to a decade of treatment records. Dr. Plascak's opinion is not *inconsistent* with Barnett's record of past treatment. But if the ALJ's real concern was the lack of backup support for Dr. Plascak's opinion, the ALJ had a mechanism to rectify the problem. An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable. 20 C.F.R. § 404.1527(c)(3); *see also* S.S.R. 96-2p at 4 ("[I]n some instances, additional develop-

ment required by a case—for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record."); *Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000) (finding that the ALJ's duty to develop the record included soliciting updated medical records when the ALJ did not afford the treating doctor's opinion controlling weight on that basis); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."). Further, although a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary. S.S.R. 96-5p at 2. Thus, the ALJ should have contacted Dr. Plascak for clarification of her medical opinions, asking for more detail regarding the frequency of Barnett's seizures or for updated medical records that supported Dr. Plascak's opinion that Barnett was disabled. *See* S.S.R. 87-6 at 2 ("There must be a satisfactory description by the treating physician of the treatment regimen and response, in addition to corroboration of the nature and frequency of seizures, to permit an informed judgment on impairment severity.").

The ALJ's decision to discredit the Barnetts' testimony also stems from a narrow view of the record and, at least insofar as the reasons given, is "patently wrong." *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (explaining that an ALJ's credibility determination will not be overturned unless it is "patently wrong" and not supported by the record). The ALJ assumed that, if Barnett's testimony that

she sometimes suffers two to three seizures a day and eight to nine seizures a week is credible, she likely would have been injured. Barnett explained, however, that because she was her own boss she could take "liberties," like going into the restaurant's office if she felt a seizure coming, to avoid an injury. The ALJ's remaining reason for discrediting Barnett's testimony—that her hearing testimony was inconsistent with what she told her doctors about the frequency and nature of her seizures—again reveals the ALJ's misapprehension of the record. The record establishes an upward trend in the frequency and severity of Barnett's seizures, and Barnett's testimony reflects that the trend continued through her disability hearing. We are given no reason to assume, as did the ALJ, that Barnett is necessarily lying about the current frequency of her seizures just because the interval between them has grown shorter. And because the ALJ discredited Jack Barnett's testimony merely because he reiterated his wife's testimony, that credibility determination is also "patently wrong." Mr. Barnett was corroborating his wife's testimony, and the ALJ appears to have no independent reason to disbelieve him.

Ultimately, though, even apart from the ALJ's misapprehension of the evidence, we would conclude that his two-sentence consideration of the Listing of Impairments is inadequate and warrants remand. *See Brindisi*, 315 F.3d at 786; *Scott*, 297 F.3d at 595-96; *Steele*, 290 F.3d at 940. All that the ALJ ever said is that he disbelieved Barnett's testimony concerning the number of seizures she was experiencing; he never affirmatively determined how many seizures he believed Barnett actually experienced. And, thus, we cannot discern if the ALJ ever considered whether Barnett's impairment equals Listing 11.03 despite her assumed lack of credibility.

Moreover, as is evident from the perfunctory discussion of the listing, the ALJ never consulted a medical expert regarding whether the listing was equaled. Whether a claimant's impairment equals a listing is a medical judgment,

and an ALJ must consider an expert's opinion on the issue. *See* 20 C.F.R. § 404.1526(b) ("Medical equivalence must be based on medical findings. . . . We will also consider the medical opinion given by one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence."); S.S.R. 96-6P at 3 ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."), *reinstating* S.S.R. 83-19; *see Farrell v. Sullivan*, 878 F.3d 985, 990 (7th Cir. 1989) (concluding that ALJ complied with requirement of Social Security Ruling 83-19 that he consider a consulting physician's opinion regarding medical equivalency). Here, the ALJ did not consult an expert regarding medical equivalence—neither Drs. Kaye, Dobson, nor Sands opined on the issue. Nor can we locate a SSA-831-U5, SSA-832-U5, or SSA-833-U5 form that would otherwise satisfy the ALJ's duty to consider an expert's opinion on medical equivalence. *See* S.S.R. 96-6P at 3; *Farrell*, 878 F.3d at 990. Yet, rather than soliciting a neurologist's opinion on the matter, the ALJ simply assumed the absence of equivalency without any relevant discussion. That assumption cannot substitute for evidence and does not support the decision to deny benefits.

Finally, we cannot discern from the record whether there are truly any jobs in the economy for a person suffering seizures on the level shown by the medical record here. Common sense causes us to question the validity of a finding that a woman suffering multiple seizures in a single day could be employed as a cashier, for example.

### III.  CONCLUSION

The judgment of the district court is REVERSED, and the case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
***Clerk of the United States Court of
Appeals for the Seventh Circuit***