UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued March 27, 2006
Decided May 11, 2006

**Before**

Hon. RICHARD D. CUDAHY, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-2803

| | |
|---|---|
| ROCHELLE SUTTON, | Appeal from the United States |
| *Plaintiff-Appellant,* | District Court for the Northern |
| | District of Illinois, Eastern Division |
| *v.* | |
| | No. 04 C 1880 |
| JO ANNE B. BARNHART, | |
| Commissioner of Social Security, | James B. Zagel, |
| *Defendant-Appellee.* | *Judge.* |

## O R D E R

Rochelle Sutton appeals the district court's judgment upholding an administrative law judge's decision to deny her disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. Her primary arguments are that the administrative law judge ("ALJ") erred in determining her residual functional capacity because he (1) "ignored" evidence of her mental impairments, and (2) wrongly discredited her subjective complaints of pain and loss of function. Because the ALJ's decision is supported by substantial evidence, we affirm the judgment of the district court.

**I.**

Sutton, who was 48 years old at the time of her hearing before the ALJ, has only a high school education and has worked primarily as a packer or sorter. She traces her claim of disability to a March 1999 injury to her shoulder when she was working in a warehouse that distributed goods to drug stores. Shortly afterwards she stopped working and has not worked for any significant period since.

Her relevant medical history includes an operation on her shoulder in August 1999 and surgery to remove a herniated disk in her neck in March 2000. The second surgery resolved her musculoskeletal problems, and though she continued to experience pain, she made significant gains in physical therapy—such that in May 2000, according to her therapist's notes, she felt "ready to return to work on a light duty basis." In September 2000, Sutton actually obtained a temporary job making boxes. Though she worked for only three days, and required some help with the lifting, she apparently accomplished her designated tasks successfully. In her own estimation, she was let go only because the job was temporary and because the employer had no other work for her unless she was "released fully."

By March 2001, Sutton's condition had improved still further. At that time, Dr. Andrew Zelby, the surgeon who performed the surgery on her neck, wrote to her primary care physician, Dr. Alvaro Pena, that "further directed treatment" would not be necessary. Although she still experienced pain, especially when she lifted her arms overhead, Sutton's spinal alignment and other signs were normal. Dr. Zelby opined that her continuing symptoms were "largely muscular" and ameliorable by reconditioning that she could do herself. He suggested that when she returned to work, she should start by lifting no more than 20 pounds, because of her long hiatus from regular employment, but he thought she could "gradually return to the same level of work that she was doing before her injury, probably over a six-week period."

Sutton never did return to work, however. In December 2001, when her private insurance benefits were terminated because Dr. Zelby and Dr. Pena had released her "to return to work full duty," she applied for social security disability insurance benefits. She claimed that she had been unable to work since April 1999 because of a variety of symptoms and conditions, including pain in her shoulder and neck, muscle spasms, depression, diabetes, and asthma. She also claimed that she was unable to write, work on the computer, do heavy lifting, or reach overhead without pain, and that she found it "stressful" to be "involved with a lot of people."

The Bureau of Disability Determination Services ("BDDS"), which was responsible for the initial adjudication of her claim, then asked Sutton to complete questionnaires about her daily activities. In these she reported that she could "basically do all the necessary household tasks," including cleaning, vacuuming, dusting, laundry, grocery shopping, and yard work, but that she could not iron

because she was right-handed and the movement caused muscle spasms. She stated that she could not use her right hand to do anything for prolonged periods and would have to stop when peeling vegetables or mopping. In addition, she indicated that she drove "often" and that she left home "everyday" to do errands, keep appointments, look for work, or visit family. She estimated that she spent "most of [her] time looking for jobs in the newspaper or the unemployment office."

The BDDS next asked Sutton's primary care physician, Dr. Pena, to complete a "psychiatric report." Dr. Pena reported that he had diagnosed Sutton with depression, but that her mood had improved when taking the antidepressant Zoloft. He said that she had "no restrictions" on her daily activities and that she had "no problem" at that time with work-related activities such as carrying out instructions, responding appropriately to supervisors and coworkers, and handling normal work pressures. The BDDS also had Sutton examined by an independent medical consultant, Dr. Mahesh Shah, who opined that she had no musculoskeletal, neurologic, or mental problems.

The BDDS denied Sutton's application for disability insurance benefits in January 2002 and denied her petition for reconsideration in May 2002. Sutton then filed a request for a hearing on her claim before an ALJ. She testified at the hearing that she had pain in her neck and shoulder every day, though she had some periods of relief, and that she had an arthritic knee which hurt variably, depending upon the weather. She believed that she was "basically in control of the pain." The ALJ asked if the pain was getting better or worse, and she said it was about the same, in both her knee and her shoulder. But she reported that her depression had been getting worse; she cried every day. When the ALJ asked if she had ever tried to work after the temporary box-making job, she said that she had been looking for work but had been unsuccessful.

The ALJ also heard testimony from a vocational expert ("VE"), who opined in answer to the ALJ's questions that there were about 17,000 jobs in the region at the light exertional level for a person of Sutton's age, education, and work experience who had a residual functional capacity for unskilled work, and further limitations of no work above the shoulders and only occasional climbing. There were also about 1,800 jobs at the sedentary exertional level. When asked by Sutton's attorney how many jobs there would be for an applicant who required a low- or no-stress job, the VE said the requirement would eliminate all jobs dealing with the public; when asked about an applicant who had a number of moderate impairments in completing tasks and dealing with supervisors and coworkers, he said that all jobs would be eliminated.

After the hearing, in response to Sutton's attorney's request for further investigation of her "psychological impairment," the ALJ ordered a consultation

with independent psychiatrist Dr. John Conran.  He also permitted Sutton to submit residual function capacity questionnaires completed by her own doctors: her then-primary-care-physician, Dr. Sharon Piller, and her psychiatrist, Dr. Elena Tylkin.  All three doctors concluded that Sutton suffered from major depression and that she faced serious though not preclusive psychological limitations on her capacity to do work.  Drs. Piller and Tylkin, though, did find her to have physical conditions that would prevent her from holding any job in the region according to the testimony of the VE.  Dr. Piller found that she could sit and stand less than two hours in an eight-hour day and that she would need unscheduled breaks and would need to be able to shift from sitting to standing or walking at will.  Dr. Tylkin anticipated that she would need to be absent from work more than four days per month.

The ALJ granted "substantial weight" to the assessments of Drs. Zelby and Pena, but discounted the assessments of Drs. Piller and Tylkin because they did not have significant experience with Sutton and, therefore, their conclusions did not appear to be based on much evidence.  The ALJ also found Dr. Tylkin's assessment internally inconsistent because she gave Sutton a Global Assessment of Functioning score that implied that she had only a slight impairment of occupational functioning, while elsewhere in the report stating that she would probably need to be absent from work more than four days per month.  Nonetheless, the ALJ concluded that the opinions of the two psychiatrists, Conran and Tylkin, "mirrored" each other "with respect to [Sutton's] capacity for unskilled work."

Applying the five-step test described in 20 C.F.R. § 404.1520; *Briscoe v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004), the ALJ found that Sutton had not been disabled at any time through the date of his decision.  He "deferred" the question whether she had "engaged in substantial gainful activity since her alleged onset of disability" (step one); and went on to find that she had a "combination of impairments considered 'severe'" (step two), though her impairments did not meet or equal any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 (step three).  He then determined that she was unable to perform any of the work that she had done in the past (step four), but that she had sufficient residual functional capacity to do "light unskilled work that does not involve reaching overhead or more than occasional climbing."  Because the VE testified that there were a significant number of jobs of that kind in the regional economy, the ALJ concluded that she was not disabled (step five).

The Appeals Council denied Sutton's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security.  *See Briscoe*, 425 F.3d at 350.  Sutton then filed a complaint in the district court seeking review of the denial of benefits under 42 U.S.C. § 405(g).  Concluding that the decision was

supported by substantial evidence, the district court granted summary judgment to the Commissioner.

## II.

We, like the district court, review the decision of the ALJ for substantial evidence and adherence to the proper legal criteria. *See* 42 U.S.C. § 405(g); *Briscoe*, 425 F.3d at 351; *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). Evidence is "substantial" if it would be accepted by a reasonable person as adequate to support the ALJ's decision. *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

### A. Evidence of Mental Impairments

Sutton first claims that the ALJ ignored evidence that she had significant mental limitations, which led him to find, erroneously, that there were jobs in the economy that she could perform. She contends that the ALJ relied selectively on Dr. Conran's assessment of her abilities and that he failed to explain his reasons for crediting certain parts of the assessment and rejecting others. But we discern no error. The ALJ specifically acknowledged Dr. Conran's finding that she had slight to moderate limitations in a number of work-related abilities. He simply chose to weight these limitations less heavily than Sutton would have liked because the finding was based on Sutton's "self-reporting" and because it was inconsistent with the totality of the record.

Sutton also argues that the ALJ "mischaracterize[d]" the assessments of psychiatrists Conran and Tylkin as suggesting that she had the capacity to do unskilled work. It is true that neither doctor "made any statement regarding unskilled work," but nor did either doctor indicate that she was "unable to meet competitive standards" in any category, even though such a rating (or its equivalent) was available on the questionnaires they completed. Therefore, the fact that they found her subject to significant limitations does not invalidate the ALJ's finding that their reports showed that she had "capacity for at least unskilled work."

Sutton next argues that the ALJ erred in failing to grant the opinions of Drs. Piller and Tylkin the "substantial weight" he granted to the opinions of Drs. Zelby and Pena. In her view, Drs. Piller and Tylkin were entitled to be considered "treating physicians," which would entitle their opinions to controlling weight as long as they were supported by medically acceptable tests and not inconsistent with other substantial evidence in the record. *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). But the ALJ did not unreasonably refuse to consider Drs. Piller and Tylkin treating physicians. A treating physician's opinion is entitled to more weight because of his longitudinal perspective. *Id.* at 377. Without evidence that the physician has such a perspective, there is no reason to accord his opinions the greater weight. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004).

Here, though there is some evidence that Sutton received diabetes medication from Dr. Piller as early as June 2002, the balance of the record suggests that Dr. Piller was Sutton's primary physician for only a few months before the time of the hearing. Sutton may have seen Dr. Tylkin over a longer period, but she saw her for only fifteen minutes every three months. And when the ALJ asked if Dr. Tylkin would "sit and counsel" with her, Sutton answered, "If that's what you want to call it." As the ALJ properly recognized, this evidence stands in sharp contrast with the evidence of her treatment under Drs. Zelby and Pena. Dr. Zelby's notes indicate that he had a "long discussion" with Sutton leading up to the March 2000 surgery. He performed the surgery, and he provided follow-up examinations, occasionally seeing her well into 2001. Dr. Pena first appears to have seen Sutton in February 2000. The record shows that he was her primary physician for at least two years; he coordinated her treatment with Dr. Zelby and treated her for pain, depression, and diabetes. In 2002, Sutton reported that she saw Dr. Pena monthly.

Moreover, even if Drs. Piller and Tylkin were considered treating physicians, their opinions would be entitled to controlling weight only if they were "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *Hofslien*, 439 F.3d at 376. But insofar as they suggest that Sutton cannot work at all, Drs. Piller and Tylkin's opinions are inconsistent with the record evidence dating from the time of her shoulder injury in 1999 to the middle of 2002. Though she had complained of depression since 1998, both Sutton and her doctors consistently expected that she would return to at least some form of light duty. Further, when specifically questioned about her mental and physical capacity to work, both Dr. Pena and the independent medical consultant Dr. Shah stated that she had no limitations that should keep her from working.

Sutton counters that to the extent the basis for Drs. Piller and Tylkin's opinions is not apparent, the ALJ was required under 20 C.F.R. § 404.1512(e) to recontact the doctors for clarification. But the regulation does not impose a duty to seek "additional evidence" unless the evidence received is inadequate to allow the ALJ to reach a conclusion about whether the applicant is disabled. *See* 20 C.F.R. § 404.1527(c)(3) (providing that ALJ "will try to obtain additional evidence" when "the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled"); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (per curiam); *cf. Barnett*, 381 F.3d at 669 (holding that ALJ must seek clarification of medical opinions where detail is lacking and must seek updated medical records). In this case there was no reason for the ALJ to think any evidence was missing; nor was there any ambiguity in Drs. Piller and Tylkin's opinions to be clarified. To require the ALJ to seek more information under these circumstances would be to shift to him the burden that belongs to Sutton. *See Scheck*, 357 F.3d at 702 (noting that applicant bears "burden of supplying adequate records and evidence").

**B. Subjective Complaints**

Sutton next argues that the ALJ erred in discrediting her testimony about her pain and functional limitations. She points to the medical records showing that she had a herniated cervical disk and that she continued to complain of pain as proof that his skepticism of her pain was unreasonable. But as we read the ALJ's opinion, he did not dispute that she suffered residual pain and discomfort in her injured neck and shoulder; he simply did not believe that it limited her effective functioning to the extent she claimed. We see nothing unreasonable about this. While an ALJ may not disregard subjective complaints simply because they are "not fully supported by objective medical evidence," a discrepancy between an applicant's complaints and the medical record is still "*probative* of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (per curiam) (emphasis added).

Sutton also contends that the ALJ erred in discrediting her complaints merely because she could perform a variety of daily activities and had sought employment up through the date of the hearing. We have warned against a "casual equating of household work to work in the labor market," *see Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005), but this does not mean that Sutton's daily activities are irrelevant. In fact, the ALJ is required to consider them under 20 C.F.R. § 404.1529. *See also* SSR 96-7p. In this case, we think the variousness of the activities, and particularly the fact that she can drive and get out of the house every day support the ALJ's finding that she is capable of light work.

Similarly, though we have recognized that an applicant may be disabled even if she is currently working—because she might have an unusually accommodating employer or be working beyond her capacity out of a desperate need—we have held that it is appropriate for the ALJ to consider any representations she has made to state authorities and prospective employers that she can work. *Schmidt*, 395 F.3d at 746. Sutton has not argued that she sought work out of desperation. And given the consistent expectations of Drs. Zelby and Pena that she would be able to work, it is less likely that her search for work was born of an unrealistic optimism. Moreover, she told the ALJ at her hearing that the reason she had not tried to work was that she had been unsuccessful in finding a job. In this context, the ALJ's inference that she may have been motivated to apply for disability benefits because she could not find work rather than because she could not perform it is not unreasonable.

Finally, Sutton argues that the ALJ gave too little weight to the side effects of her many medications and to the impact of her obesity. (To put the obesity in perspective, at the time of her application for disability insurance benefits, she was 5'7" and weighed 239 pounds.) But she presented no evidence that side effects played any significant role in her alleged inability to work. And obesity is not itself an impairment; it is rather a cause of impairment. *See Gentle*, 430 F.3d at 868. So

the fact that the ALJ failed to mention her obesity matters little.  In *Skarbek*, we held that the ALJ did not err in omitting to mention the applicant's obesity where it was presumably factored into the doctors' reports and the applicant did not explain how it "further impaired his ability to work."  *Skarbek*, 390 F.3d at 504.  Here, because Sutton has been obese throughout the history of her medical treatment, and because her obesity has been remarked upon by her doctors, we have no reason to doubt that it was properly taken into account.

We may not reweigh the evidence or substitute our judgment for that of the ALJ, *see Skarbek*, 390 F.3d at 503, even if another position is also supported by substantial evidence, *see Scheck*, 357 F.3d at 699.  Accordingly, we affirm the judgment of the district court.