NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0876n.06
Filed: October 26, 2005

No. 04-6332

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KENNETH R. SHARP, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF TENNESSEE |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: NELSON and SUTTON, Circuit Judges; ZATKOFF, District Judge.[*]

SUTTON, Circuit Judge. Kenneth Sharp asks us to review a district court's judgment that substantial evidence supports the decision of an administrative law judge (ALJ) denying Sharp disability benefits under the Social Security Act. *See* 42 U.S.C. §§ 416(i), 423(d) & 1382c. Because the ALJ's decision failed to give sufficient reasons for discounting the opinions of some of Sharp's treating physicians, we remand the case for further fact-finding at the agency level.

---

[*] The Honorable Lawrence P. Zatkoff, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

No. 04-6332
*Sharp v. Barnhart*

I.

Born in 1955, Kenneth Sharp worked for 16 years as a bread-delivery driver. On April 17, 2001, Sharp stopped working at his delivery job due to orthopedic impairments in his right ankle and left knee, recurrent vertigo, depression and anxiety disorders. His right ankle has been the subject of five surgeries, including a fusion of the joint that requires him to wear a special shoe and walk with a cane. Although he had surgery on his left knee in May of 2001, that knee still "locks up," swells and eventually will require a full replacement. His vertigo symptoms stem from two sources: (1) Benign Positional Vertigo, which "is an inner ear problem that results in short lasting, but severe, room-spinning vertigo," Jeffrey P. Harris, M.D., Ph.D., Dizziness and Benign Positional Vertigo (Feb. 20, 2000), http://www-surgery.ucsd.edu/ent/PatientInfo/info_bppv.html; and (2) Meniere's disease, a distinct inner-ear "disorder characterized by symptoms including recurrent vertigo, sensory hearing loss, tinnitus [ringing in the ear], and a feeling of fullness in the ear," Comm'r Br. at 4 n.1.

In 1996, Dr. Horton first diagnosed Sharp's vertigo and Meniere's disease and prescribed Dyazide to treat the vertigo. A checkup in December 1996 revealed that the Dyazide was successfully managing Sharp's symptoms and as of May 1998 the Dyazide was limiting the vertigo to infrequent spells. By September 1999, however, Sharp reported a flare-up of the vertigo, and Dr. Horton urged Sharp to perform special exercises, called VHD exercises, and prescribed Xanax to address the new symptoms. By December 1999, Sharp required and received a special physical

therapy treatment, called an otolith repositioning, on his left ear. After another bout with severe vertigo symptoms, this treatment was repeated in April 2000.

In May 2001, Sharp sought additional treatment for his vertigo from an ear, nose and throat specialist, Dr. Schwaber, who concluded that Sharp was not responding well to the otolith repositioning. Dr. Schwaber also noted that Sharp suffered from almost continuous Benign Positional Vertigo in his left ear as well as relatively inactive vertigo in his right ear. Several months later, in October 2001, Dr. Shwaber performed a surgical procedure on Sharp's right inner ear in an attempt to treat the Meniere's disease. At this time Dr. Schwaber also indicated that Sharp's impairments would force him to miss 10 days of work per month. Sharp gained some relief after the operation, but by February 2002, and again in August 2002, he reported continued dizziness as well as tinnitus. In March 2002, Sharp indicated that merely tilting his head triggered dizziness, and Dr. Schwaber prescribed steroid treatment for the Meneire's disease in his right ear. In October 2002, Dr. Schwaber reported that Sharp suffered from recurrent vertigo and repeated his opinion that Sharp would miss 10 days of work per month as a result of the disease.

In June 2001, Sharp applied for federal disability benefits under the Social Security Act. When the agency denied his application, he sought review of that decision before an ALJ. In determining that Sharp was not disabled under the Act, the ALJ reached the following conclusions (in accordance with the requisite five-step analysis): (1) Sharp had not engaged in any gainful employment since April 2001; (2) Sharp suffered from severe impairments; (3) these impairments did not meet or medically equal any of the listed impairments in the regulations; (4) Sharp's

impairments prevented him from performing his past work; and (5) Sharp had "the residual functional capacity to perform a significant range of light work," which means that "there are a significant number of jobs in the national economy that he [can] perform." ALJ Op. at 9–10. As to the last point, the ALJ found that Sharp's "residual functional capacity" includes:

- "the ability to lift and carry 20 pounds occasionally and 10 pounds frequently";
- the need "to combine sitting and standing/walking at his discretion over an 8-hour period";
- the need to refrain from "crawl[ing], kneel[ing], crouch[ing], or climb[ing] ladders, ropes, or scaffolds"; and
- the need to "avoid work at unprotected heights or involving equipment operation, including vehicle driving."

ALJ Op. at 9. Based on testimony from a vocational expert, the ALJ also determined that the following jobs were available to Sharp—"grader/sorter, production checker or examiner, and assembly worker"—and that these jobs customarily tolerate two absences per month. ALJ Op. at 8. The ALJ then determined that the opinions of several of Sharp's treating physicians—who each indicated that Sharp would be required to miss 10 out of every 30 days of work due to his ailments—were neither persuasive nor controlling. The ALJ concluded that Sharp was not disabled and denied his application for benefits. ALJ Op. at 9–10.

Sharp sought review of this decision from the Appeals Council, which denied his request and adopted the ALJ's decision as the Commissioner's final decision. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Sharp then filed this action in federal district court. *See*

42 U.S.C. §§ 405(g) & 1383(c)(3).  In granting the Commissioner's motion for summary judgment, the district court concluded that substantial evidence supported the ALJ's decision.  D. Ct. Op. at 6.

## II.

The ground rules for this kind of appeal are well established.  We review the district court's summary judgment decision de novo.  *Walker v. Sec'y of Health and Human Servs.*, 980 F.2d 1066, 1069 (6th Cir. 1992).  Because the Commissioner adopted the ALJ's decision as the Commissioner's own, it is the ALJ's decision that we review.  *Wilson*, 378 F.3d at 543–44.  And we will affirm the ALJ's decision if substantial evidence supports it.  42 U.S.C. § 405(g); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

## A.

Sharp initially challenges the ALJ's handling of the vocational expert's testimony in the case.  Focusing on the ALJ's instruction to the vocational expert that he should assume that a hypothetical worker could alternate between sitting or standing at his discretion, Sharp contends that this instruction contradicts Social Security Ruling 83-12, which says that "unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will."  Soc. Sec. Rul. 83-12, 1983 WL 31253, at *4 (1983).  Read in context, however, this instruction does not slight the ruling but respects it.  The ALJ first asked the vocational expert if any jobs were available to a hypothetical worker suffering from limitations like Sharp's.  The ALJ then clarified the question by asking the

expert to list only those jobs where "a person could either perform the job sitting or standing at [his or her] discretion" and where exercising that discretion would not result in "any supervisor, or managerial, repercussions." JA 75. Rather than contradicting the Social Security ruling, this instruction seeks to identify only those jobs that Sharp's impairments would allow him to perform. This accords with the ruling's directive that "[i]n cases of unusual limitation of ability to sit or stand, [an expert] should be consulted to clarify the implications for the occupational base." Soc. Sec. Rul. 83-12, 1983 WL 31253, at *4 (1983).

B.

Sharp next argues that the ALJ should have found him illiterate, which (he claims) would have established that he is disabled under the following regulation:

> [A] finding of "disabled" is warranted for individuals age 45–49 who: (i) Are restricted to sedentary work, (ii) Are unskilled or have no transferable skills, (iii) Have no past relevant work or can no longer perform past relevant work, and (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

20 C.F.R. pt. 404 subpt. P, app. 2 § 201.00(h)(1). But even if the ALJ had found Sharp illiterate, satisfying subsection (iv) of the regulation, Sharp still would not have satisfied this definition of disability. Subsection (i) of the same regulation says that the individual must be restricted to sedentary work, which among other things "involves lifting no more than 10 pounds." 20 C.F.R. § 404.1567(a). The ALJ, however, found that Sharp was capable of "lift[ing] and carry[ing] 20 pounds occasionally," a finding that Sharp does not contest. ALJ Op. at 9. Either way, whether the

ALJ found Sharp illiterate or not, Sharp could not have satisfied the definition of disability under the regulation.

C.

Sharp, lastly, contends that the ALJ failed to respect the opinions of his treating physicians, namely their opinions that his disabilities will force him to miss 10 days of work every month. We agree with this contention in part and disagree with it in part.

In refusing to give controlling weight to a treating physician's opinion, an ALJ must adhere to certain agency-imposed procedural requirements. The ALJ must "evaluate every medical opinion [ ] receive[d]" and must "give good reasons in [his] notice of determination or decision for the weight [ ] give[n]" to a treating physician's opinion. 20 C.F.R. § 404.1527(d); *Wilson*, 378 F.3d at 544. A treating physician's opinion receives controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence." *Wilson*, 378 F.3d at 544. Even when the treating physician's opinion does not deserve "controlling weight," the ALJ "must" consider "certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion." *Id.* In other words, "a decision denying benefits 'must contain *specific reasons* for the weight given to the treating [physician's] medical opinion.'" *Id.* (emphasis added). Generally speaking, if an ALJ's

decision fails to follow these procedural rules, the decision should not be affirmed unless it can be shown that any error was harmless. *See, e.g.*, *id.* at 547 (holding that remand was necessary when the ALJ failed to adhere to § 404.1527(d)(2)'s procedural requirements and noting that "a *de minimis* violation [of those procedural requirements] may qualify as harmless error"); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528 (6th Cir. 2001) (holding that remand was not required and that the ALJ's failure to mention treating physician's opinion was harmless error because the ALJ adopted the treating physician's recommendations); *see also Hall v. Comm'r of Soc. Sec.*, No. 04-5572, 2005 WL 2139890, *6–7 (6th Cir. Sep. 2, 2005).

In this case, the ALJ satisfied these procedural requirements with respect to the opinions of some of Sharp's treating physicians but not with respect to others of them. The ALJ's refusal to give controlling weight to Sharp's treating physicians' opinions with respect to his alleged *depression/anxiety disorders* did not violate these requirements and is supported by substantial evidence. Contrary to Sharp's contention, the ALJ did not ignore the opinions of Drs. Haskins and Smith but found that they did not describe an impairment satisfying the regulations' "duration requirement," which mandates that the impairment be "expected to result in death" or "last[] or [be] expected to last for a continuous period of at least 12 months." ALJ Op. at 3 (citing 20 C.F.R. §§ 404.1509, 416.909). In the face of this unsatisfied requirement, Sharp fails to offer a tenable explanation as to how the opinions of Drs. Haskins and Smith could lead to a legitimate finding of disability.

Sharp does not fare any better when it comes to his treating physicians' opinions about absenteeism resulting from his *orthopedic impairments.* In saying that Sharp would be forced to miss 10 out of every 30 days of work, his orthopedic doctors never explained why an individual afflicted with knee and ankle problems like Sharp's could not handle a sedentary job or for that matter could not handle one of the jobs listed by the vocational expert. Thus, even if it could fairly be said that the ALJ did not comply with the procedural requirements for rejecting the opinion of a treating physician, any error in this respect was harmless. *See Wilson*, 378 F.3d at 547 ("[I]f a treating [physician's] opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal.").

The ALJ's treatment of the treating physicians' opinions about Sharp's *vertigo* and *Meniere's disease* is a different matter. In rejecting the doctors' opinions that these diseases would force Sharp to miss 10 days of work a month, the ALJ gave the following explanations: (1) none of Sharp's physicians had "seen [Sharp] a total of 10 times, much less 10 times in any given month after April 2001"; (2) "the frequency of [the physicians'] individual examinations/treatments . . . do[] not match the [frequency of] absences that they provided" in their opinions; (3) "the issue of disability based upon frequent absenteeism . . . remains an issue reserved to the Commissioner"; and (4) the physicians' "opinions as to the frequency of absences must be based on a solid clinical and diagnostic foundation which is not manifest in the instant record." ALJ Op. at 6.

The first two bases for the ALJ's decision do not support it. Neither the ALJ nor the government attorney tasked with defending the ALJ's decision has given us any explanation why

a doctor must see a patient 10 days out of a month in order to estimate that a disease will lead to this kind of absenteeism. As a general matter, doctors in good faith surely may rely on what their patients tell them have been their symptoms between one visit and another. And surely they may make reasoned assessments (again as a general matter) about the seriousness of a disease based on an objectively-supported diagnosis of the disease, the symptoms reported to them by their patients, the progression of the disease and their medical understanding of the disease. *See, e.g.*, 20 C.F.R. § 404.1528 (indicating that medical findings are based on symptoms (a patient's "description" of the "impairment"), signs ("anatomical, physiological, or psychological abnormalities which can be observed, apart from [symptoms]") and laboratory findings ("anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques")). To our knowledge, no regulation or court decision imposes any such requirement, and several cases appear to suggest that just the opposite is true—particularly with respect to episodic illnesses like the ones afflicting Sharp. *See, e.g.*, *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005) (finding that a treating doctor's estimate concerning the frequency of epileptic seizures should have been credited by the ALJ even though the disability-benefits applicant had not visited a doctor each time a seizure had occurred); *Davis-Atkinson v. Barnhart*, No. 03-6098, 2004 U.S. App. LEXIS 1578, at *8–9 (2d Cir. Feb. 3, 2004) (finding that upon remand the Commissioner needed to reconsider in greater detail, among other things, a treating physician's opinion—based on patient visits occurring every three months—that the disability-benefits applicant suffered from "non-epileptic seizures one to two times a day").

Nor are we aware of any regulatory or case support for the third explanation given by the ALJ—that "the issue of disability based upon frequent absenteeism . . . remains an issue reserved to the Commissioner." ALJ Op. at 6. Granted, no ALJ must accept a doctor's conclusory statement that a patient is disabled. *See* 20 C.F.R. 404.1527(e)(1) (stating that a doctor's diagnosis of "disabled" does not mandate a finding that an applicant is disabled under the Social Security Act). And, granted, the opinions of Sharp's vertigo doctors that he would miss 10 out of every 30 days of work come close to stating an ultimate opinion about the existence of a disability. But in this instance these opinions came at the end of extensive treatment for the disease. From the first diagnosis in 1996 to the ALJ's decision, Sharp underwent frequent treatments for vertigo and Meniere's disease—with the diagnoses and symptoms continuing to worsen over time despite more aggressive treatments, the use of specialists and surgery. Sharp's extensive medical records paint a picture of an individual faced with a serious ailment that has increasingly interfered with his daily activities, whether work related or not. "[I]n evaluating . . . [an] episodic disease," this court has noted, "consideration should be given to the frequency and duration of the [disease's] exacerbations, the length of the remissions, and the evidence of any permanent disabilities." *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990). Consistent with this approach, Sharp's treating physician stated that "[i]t is my estimation that approximately ten days per month [Sharp] has such a severe episode [of vertigo] that he is not able to work," that such episodes are "associated with nausea, vomiting, ataxia, and severe disequilibrium" and that "[i]t is simply best just to go to bed when that occurs." JA 462 (letter from Mitchell K. Schwaber, M.D., to Kenneth A. Miller dated October 28, 2002). In the context of this case and this episodic disease, the ALJ has failed adequately to explain why Dr.

Schwaber's opinion (if not the opinions of other treating doctors) should not be treated as a valid medical opinion regarding "the frequency and duration of the disease's exacerbations" rather than an opinion "on issues reserved to the Commissioner." *See Groskreutz v. Barnhart*, No. 03-3666, 2004 U.S. App. LEXIS 18565, at *17 (7th Cir. Aug. 24, 2004) ("The ALJ erroneously disregarded [a physician's] opinion regarding how much weight [the applicant] could lift and how many days of work she may have to miss."); *Alexander v. Barnhart*, No. 02-5046, 2003 U.S. App. LEXIS 18202, at *10 (10th Cir. Sep. 2, 2003) (recognizing that the ALJ erred in disregarding a treating physician's opinion that a disability-benefits applicant "might miss a day a week of work and need to lie down twice a day"); *Abendroth v. Barnhart*, No.01-2696 , 2002 U.S. App. LEXIS 105, at *10 (7th Cir. Jan. 3, 2002) (recognizing treating physician's opinion "that he 'would expect' [the applicant] to miss 'more than two or more' days of work per month" as an "opinion regarding the nature and severity of a medical condition [that] is entitled to controlling weight if well-supported by medical findings and not inconsistent with other substantial evidence").

That leaves the ALJ's last justification—that the treating physicians' opinions are not based on "medically acceptable clinical and laboratory diagnostic techniques." ALJ Op. at 6. While we do not doubt that this ground may provide a valid reason for denying a disability claim in the abstract, the ALJ gave no explanation why these physicians' opinions were deficient or what medical evidence or tests would have satisfied the ALJ in the context of Meniere's disease and Benign Positional Vertigo. Neither does the ALJ explain why the extensive test results, diagnoses and other information contained in Sharp's submitted medical records do not suffice to support his

physicians' opinions. *See, e.g.*, JA 287 (Dr. Horton discussing Sharp's continued reporting of symptoms despite a normal electronystagmograph (ENG)); JA 282 (Dr. Horton ordering a lymphocyte transformation test); JA 285 (Dr. Horton ordering ENG, auditory brain stem response (ABR) and electrocochleography (ECoG) exams); JA 271, 272, 279, 280, 284, 286 (various test results); JA 283 (noting that an ENG indicated possible Benign Positional Vertigo, an ABR suggested a right retrocochlear lesion, an ECoG suggested Meniere's disease and a negative result from a magnetic resonance imaging test); JA 273 (Dr. Horton indicating that following an acute exacerbation of his vertigo and accompanying testing of Sharp's ear, "the right ear [ ] is down pretty much across the board as much as 10 decibels"); JA 352 (narrative diagnosis of Meniere's disease and Benign Positional Vertigo by Dr. Schwaber); JA 350–51 (examination notes from Dr. Schwaber). The medical opinions of the agency's two reviewing physicians, it bears adding, did not contradict these tests and diagnoses. *See* JA 363–70, 387–94.

In the face of the extensive records and specific diagnoses introduced by Sharp, the ALJ's generalized comment that the treating physicians' opinions were not "based on a solid clinical and diagnostic foundation," with no elaboration or detail, does not satisfy the procedural requirements for rejecting a treating physician's opinion laid out in § 404.1527(d)(2). *See Wilson*, 378 F.3d at 546. What the court said in *Wilson* applies with equal force here: "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might

be especially bewildered when told by an administrative bureaucracy that [he] is not." *Wilson*, 378 F.3d at 544.

At the same time, we cannot grant Sharp's application for disability benefits on this record because "all essential factual issues" have not have been resolved and the current record does not "adequately establish[]" his entitlement to disability benefits. *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Under these circumstances, the better course is to remand the matter to the agency for further factfinding by the ALJ and an opportunity to introduce additional evidence regarding the impact of Sharp's vertigo and Meniere's disease on his ability to work.

III.

For these reasons, we reverse the district court's grant of summary judgment and remand the case to the district court with instructions to remand to the agency for further factfinding as well as the opportunity to present additional evidence.