In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3930

LEE ANN SCHMIDT,

*Plaintiff-Appellant*,

*v.*

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05 C 741—**John C. Shabaz**, *Judge*.

———————

ARGUED MAY 4, 2007—DECIDED AUGUST 8, 2007

———————

Before POSNER, MANION, and KANNE, *Circuit Judges*.

MANION, *Circuit Judge*. Lee Ann Schmidt appeals the district court's order upholding the denial of her applications for disability insurance benefits and supplemental security income by the Social Security Administration. Schmidt contends that the administrative law judge ("ALJ") erred by not giving controlling weight to her treating physicians' opinions, by finding that her testimony lacked credibility, and by failing to take into account additional limitations when questioning the vocational expert. We affirm.

I.

Lee Ann Schmidt suffers from a series of health problems, beginning with a back injury that she sustained at work in November 1996. She sought treatment from T. Sunil Thomas, M.D., from January 1997 through March 1998. Dr. Thomas performed two surgeries on Schmidt's back, a left-side laminectomy and disketomy at L5-S1, and an anterior disketomy and fusion at L5-S1.

In May 1998, Schmidt moved to Oklahoma and continued her treatment with Jeffery Nees, M.D. On December 14, 1998, Dr. Nees stated that Schmidt had a normal gait, good bilateral heel and toe walking, and she showed "no gross deficits to my exam today." He concluded that Schmidt "ha[d] reached fairly maximum medical benefit," and released her from his care with the understanding that she would undertake vocational rehabilitation. Approximately one month later, Dr. Nees stated that, in his opinion, Schmidt's existing ailments resulted in a 45% permanent disability. He further opined that Schmidt could return to limited employment on February 1, 1999, with the restriction that she not lift more than fifteen pounds at a time, avoid repetitive bending, stooping, or twisting, and that she be allowed to change position freely.

Schmidt returned to Wisconsin and to Dr. Thomas for evaluation and follow-up care. In November 1999, Dr. Thomas completed a Wisconsin Department of Workforce Development form indicating that Schmidt was able to work part-time, with limitations. Approximately two months later, Dr. Thomas opined that he agreed with Dr. Nees' assessment of Schmidt, including Dr. Nees' conclusion that Schmidt had been capable of working half-days (four hours per day) since February 1, 1999.

Two years later, in February 2002, Nathaniel S. Jalil, M.D., an internist/nephrologist, evaluated Schmidt. Dr. Jalil opined that Schmidt had "no significant past medical history except for depression[,]" for which "she is on Zoloft." Schmidt reported to Dr. Jalil that she had a "history of pain in both knee joints off and on for many years." She also stated that she had been working at a new job that required her to stand continuously for four hours, which caused her to experience pain in both of her knee joints and her back. Dr. Jalil concluded that "[overall], the patient is doing pretty good." He prescribed an anti-inflammatory for Schmidt's sore knees, encouraged her to continue walking, and referred her to Scott E. Cameron, M.D., an orthopaedic surgeon. Dr. Cameron evaluated Schmidt's knees and diagnosed her with bilateral hypermobile patellae with positive apprehension signs bilaterally. He also noted that Schmidt had no effusion, crepitance, tenderness, or arthritic changes, and her X-rays were unremarkable. Finally, Dr. Cameron recommended that Schmidt adjust her lifestyle to accommodate her knees.

In March 2002, Somsak Tanawattanacharoen, M.D., evaluated Schmidt for chronic low back pain. Schmidt told Dr. Tanawattanacharoen that she was working part-time with a work restriction due to her low back pain. In his examination of Schmidt, Dr. Tanawattanacharoen found no evidence of lumbar disc syndrome, no tenderness or muscle spasms, normal bilateral straight-leg raising, normal neurological functions, 5/5 muscle strength in the lower extremities, no weakness of the big toe muscles, and intact sensation along the lateral aspects of both feet. Dr. Tanawattanacharoen then prescribed anti-inflammatory medication and physical therapy. Later that month, Schmidt failed to show up for her first physical therapy

session because she forgot about it, but she stated that she would reschedule after she returned from a two-week vacation if she was still having problems. Schmidt never rescheduled.

In July 2002, Schmidt called Dr. Jalil's office to request medication to alleviate her back pain, and Dr. Jalil prescribed Ultracet. Later that month, Dr. Jalil reevaluated Schmidt, who was requesting a doctor's note stating that she needed to live on a first-floor apartment in addition to pain medication samples. Dr. Jalil noted that Schmidt complained that she still was experiencing back pain that radiated down her legs stemming from her back surgery, and that she was taking medication that he prescribed to her to alleviate her pain. Other than her back pain, Dr. Jalil opined that Schmidt was "doing very good." Following his examination, he provided Schmidt with the note that she requested and some medication samples.

In July 2002 and January 2003, two physicians working on behalf of a state agency reviewed Schmidt's medical records.[1] They concluded that Schmidt could perform work consistent with medium exertion. The state physicians noted, however, that Schmidt had postural limitations on some activities, such as stooping, kneeling, crouching, and crawling.

In February 2003, Schmidt returned to Dr. Jalil complaining about a recent flare-up of her back and joint pain. Dr. Jalil referred Schmidt to a rheumatologist, Marlon J. Navarro, M.D. When Dr. Navarro examined Schmidt a

---

[1] In March 2002, Schmidt applied for disability insurance benefits and supplemental security income, which triggered the state agency's review of her medical records.

few days later, she complained of constant dull back pain, constant numbness and tingling in her left leg, increased stiffness in her lower back, intermittent ankle, wrist, hand, and hip pain, hypermobile patellae, and swollen knee and ankle joints. She also told Dr. Navarro that she was performing all of her activities of daily living, but she was no longer employed, and she was applying for Social Security disability. Dr. Navarro opined that Schmidt had a normal neurological examination with intact sensation and systematic normal deep tendon reflexes in both her upper and lower extremities. While Schmidt stated that it was too painful for her to flex her lumbar spine, Dr. Navaro found that her right and left rotation and flexion were normal. He further opined that Schmidt's sacroiliac maneuvers were negative, she had no spinal tenderness, and her total body examination did not reveal any swelling, restricted motion, tenderness, or instability. Ultimately, Dr. Navarro diagnosed Schmidt as suffering from joint and back pain, and, with the exception of her knee condition, Schmidt's pain likely was the result of early degenerative joint disease. He then recommended that Schmidt use different pain medications and referred her to a pain clinic for her joint pain.

Approximately one week later, Schmidt had another follow-up appointment with Dr. Jalil. Dr. Jalil noted that Schmidt complained of back pain and pain radiating into her lower extremities, especially on the left side. Schmidt further complained of difficulty bending over, sitting up from a supine position, and prolonged standing. When Dr. Jalil examined Schmidt, he found no focal neurological deficits and normal superficial and deep tendon reflexes, but her gait was slightly unstable, her leg raising was positive on the left, she had some spinal

tenderness, and she had a slight sensory deficit over her big and second toes. Dr. Jalil reassured Schmidt that the pain in her back was due to osteoarthritis and her previous back surgeries, and noted that Schmidt had a generally benign physical examination. He noted that "[a]t this stage, not much can be done for her back pain[,]" and he did not recommend any treatment beyond Schmidt's previously prescribed medications.

The next month, April 2003, Schmidt returned to Dr. Jalil complaining of numbness in her left leg. When Dr. Jalil examined Schmidt, he again did not detect any additional physical problems. He then referred Schmidt to a neurologist, Sarat Ahluwalia, M.D. Two weeks later, Dr. Ahluwalia examined Schmidt. Schmidt complained of chronic back and leg pain and new symptoms of right leg pain with radiation. Following her examination, Dr. Ahluwalia concluded that Schmidt was in no apparent distress and had only mild neck tenderness. Schmidt's motor examination showed normal strength in both of her upper extremities, but her lower extremity examination revealed mild muscle weakness, some decreased sensation, and brisk reflexes on her left side. Dr. Ahluwalia diagnosed Schmidt as suffering from low back pain with some radicular features and recommended that she undergo another magnetic resonance imaging ("MRI") scan of her spine. Schmidt's MRI of her lumbar spine showed satisfactory post-operative changes, no defined recurrent or residual disc protrusion or bulging, and only mild facet degenerative changes and a possible cyst. The MRI of Schmidt's cervical spine showed a small broad-based right disc protrusion with very mild stenosis. Dr. Ahluwalia prescribed physical therapy, a Transcutaneous Electrical Nerve Stimulation ("TENS") unit, and medication.

In June 2003, Schmidt had an electromyograph ("EMG") and nerve conduction studies of her left leg, which showed normal results with no evidence of radiculopathy or neuropathy. That same month, Schmidt returned to Dr. Ahluwalia for a follow-up examination. She reported that her symptoms were unchanged. When Dr. Ahluwalia examined Schmidt, she noted that Schmidt had normal motor examination with full strength in all muscle groups, with the exception of mild weakness in her left toe. She also reviewed Schmidt's diagnostic tests. Dr. Ahluwalia concluded that Schmidt's back and neck pain were myofascial, so she recommended additional testing and an MRI scan of Schmidt's brain. She further recommended that Schmidt continue taking her medication and undergoing physical therapy.

The next week, Schmidt saw Dr. Jalil for a follow-up examination. Schmidt again complained of numbness and tingling in her upper and lower extremities, as well as neck pain. Following his examination, Dr. Jalil noted that he "did not find anything significant." He slightly adjusted Schmidt's pain medication and scheduled her for a follow-up visit in three months.

Contrary to Dr. Ahluwalia's treatment plan, Schmidt began skipping her physical therapy sessions. While Schmidt attended two sessions in April 2003, she missed her appointment on May 1, 2003. In notes dated July 23, 2003, Schmidt's physical therapist stated that it was unknown whether Schmidt met the goals of the treatment, and if Schmidt continued to miss her appointments without notification, then she "will be considered discharged from treatment." Schmidt never returned to physical therapy.

In October 2003, Schmidt returned to Dr. Jalil for a follow-up examination. Schmidt complained of numerous maladies, including short-term memory loss, numbness and tingling in her lower extremities, dizziness, and a dry cough. Following his examination, Dr. Jalil noted that Schmidt had a normal ear examination, except for a little fluid behind the right ear, an enlarged and swollen lymph node on the right side of her neck, and bilateral rhonchi and wheezing. He diagnosed Schmidt as suffering from dizziness and vertigo, otitis media, and bronchitis, as well as being a "chronic smoker." Dr. Jalil adjusted Schmidt's medications and recommended that she abandon her smoking habit. He also ordered chest X-rays and laboratory studies, all of which returned normal results.

Two months later, in December 2003, Schmidt returned to Dr. Jalil and asked him to sign a "Functional Capacity Questionnaire" prepared by her attorney. On that questionnaire, Dr. Jalil noted that Schmidt suffered from arthritis of the lumbar spine, status post-fusion, arthritis of the cervical sine, and depression. He further stated that he prescribed for Schmidt both pain medication and medication for her depression. Dr. Jalil also checked "yes" to indicate that Schmidt had "chronic and disabling pain"; that her emotional condition contributed to her pain; and that she could not be expected to concentrate and pay attention to details after performing sedentary work for even a few hours. He further opined that Schmidt could perform only very low-stress jobs with the limitation that she be able to sit or stand at her option, and that she was incapable of even sedentary work on a sustained basis. Finally, Dr. Jalil opined that Schmidt either would have to leave work early or miss work more than four times per month.

In addition to her medical treatment for her physical ailments, Schmidt also sought treatment for her mental impairments from Marcus P. Desmonde, Psy.D/L.P., beginning in July 2002. Schmidt complained of depression related to her physical problems and stated that she had been taking Zoloft. Following his examination, Dr. Desmonde noted that Schmidt's concentration was above average, and that she was outgoing, friendly, cooperative, spontaneous, and uninhibited. Schmidt told Dr. Desmonde that she did not have any thought disorders, suicidal or homicidal ideation, or symptoms of anxiety or panic. She also stated that the symptoms of her depression were "well regulated on her Zoloft." Dr. Desmonde diagnosed Schmidt as suffering from an adjustment disorder with depressed mode and assessed her Global Assessment of Functioning ("GAF") in the prior six months between fifty-five and sixty, which indicated mild to moderate symptoms. He opined that Schmidt appeared capable of understanding simple to moderately complex instructions, as well as interacting appropriately with supervisors, co-workers, and the general public. Dr. Desmonde did note, however, that Schmidt "may have difficulty tolerating the stress and pressure of full time, competitive employment at this time."

In July 2002 and January 2003, two psychologists working on behalf of a state agency reviewed Schmidt's medical records.[2] They concluded that Schmidt did not have any significant work-related limitations caused by a mental impairment.

---

[2] Like the state physicians' review of Schmidt's medical records, this review was triggered by Schmidt's March 2002 application for disability insurance benefits and supplemental security income.

In January 2003, Schmidt began individual therapy with a social worker, Mary T. Sirek, MSW. After missing her first appointment, Schmidt met with Sirek, and her chief complaints were pain and sadness. Schmidt endorsed all of the symptoms of a major depressive disorder and reported a previous suicide attempt that did not require hospitalization. She also reported suffering from panic attacks, but stated that taking Zoloft "helped significantly." Sirek diagnosed Schmidt as suffering from a major depressive disorder, single episode, and panic disorder with agoraphobia in remission. She also assessed Schmidt a current GAF score of fifty-five, which indicated a moderate impairment. Sirek recommended that Schmidt attend bi-weekly therapy sessions.

Schmidt returned two weeks later, and Sirek described her as "very positive" and stated that she "looks very good today." Sirek also noted that noted that Schmidt "did not complain of her pain," nor did she "seem to be in as much pain as she has been in the past." Schmidt then missed several therapy sessions and was not seen again for more than two months. When Schmidt returned to therapy in April 2003, Schmidt told Sirek that "for the most part . . . things have been going quite well," with the exception of feeling increased pain in her back, hips, and knee. Schmidt then missed another series of therapy sessions. On June 13, 2003, Sirek noted that Schmidt "was a no show four times and seen only three times," and "[s]he never responded to my letters regarding her no shows." Sirek concluded that Schmidt's "appointments were so scattered she never really invested in her goals." She then discharged Schmidt from her care, citing "patient withdraw."

In October 2003, at the request of the state agency, Dr. Desmonde re-evaluated Schmidt. Dr. Desmonde reviewed

his notes from his prior examinations of Schmidt, as well as Sirek's notes. He found no evidence of a personality disorder. Ultimately, Dr. Desmonde concluded that his current assessment was consistent with his July 2002 evaluation, namely that Schmidt suffered from an adjustment disorder with depressed mood with mild to moderate symptoms. He reiterated that she appeared "capable of understanding simple to complex instructions and carrying out tasks with reasonable persistence and pace for 2 to 3 hours. She interacts appropriately with co-workers, supervisors and has little contact with the general public in her current bookkeeping job." Finally, he opined that Schmidt "currently tolerates the stress and pressure of part time employment, but may have difficulty tolerating the stress and pressure of full time, competitive employment."

In March 2002, during the time that she was being treated for the physical and mental conditions discussed above, Schmidt applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging a disability onset date of January 24, 2002. Specifically, Schmidt's applications stated that her ability to work is limited because of her "[l]ower back fusion, with nerve damage. Both knees dislocate very easy." The Social Security Administration ("Agency") denied Schmidt's applications at the initial stage and on reconsideration. Schmidt then requested a hearing on her claim before an ALJ.

During the hearing before the ALJ, Schmidt was represented by counsel and testified on her own behalf. In addition to testifying about her back and knee pain, Schmidt testified that she could no longer perform her former, part-time job as a bookkeeper in a typical office

setting because she needed to get up and move around, she could not sit for long periods of time, and she made errors due to her pain. She also testified that she was able to drive, perform household chores, cook, wash dishes, and launder her clothes. Schmidt stated, however, that she had difficulty with grocery shopping and had problems using stairs. Finally, Schmidt testified that she was taking both pain and anti-inflammatory medicine, in addition to over-the-counter Tylenol.

A vocational expert also testified during Schmidt's hearing before the ALJ. The ALJ asked the vocational expert a hypothetical question regarding an individual of Schmidt's age, education, and previous work experience who had similar impairments, including back and leg pain, pain and numbness in her hand and arm, knee pain, bilateral hyper-mobile knees, and who suffers from depression and adjustment disorder with depressed mood. Additionally, the ALJ asked the vocational expert to assume that the hypothetical individual was able to perform light work with a sit/stand option and no more than occasional bending, twisting, stooping, kneeling, crawling, and climbing. Finally, the ALJ told the vocational expert to accommodate the need for reduced stress by considering work that would not involve high production goals or more than simple to moderately complex instructions. The vocational expert responded that such an individual could not perform Schmidt's past relevant work, but could perform various other jobs with light duty limitations, such as cashier (6,000 jobs in Wisconsin) or assembly-type manufacturing (7,000 jobs in Wisconsin). The vocational expert further testified that if the hypothetical individual was limited to sedentary work, the individ-

ual could perform both cashier (11,000)[3] and assembly-type manufacturing (6,000) jobs. The vocational expert also stated that his testimony would not change if the hypothetical individual was limited to unskilled work and was precluded from power gripping. Noting that the vocational expert's testimony was based on the hypothetical individual working eight-hour days, five days per week, Schmidt's attorney asked if those same jobs would be available if the hypothetical individual was restricted to working no more than half-days or four hours at a time. The vocational expert responded that all of the jobs he previously identified would be eliminated.

The ALJ denied Schmidt's applications for DIB and SSI benefits, holding that Schmidt failed to carry her burden of proving that she was disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Specifically, the ALJ concluded that Schmidt failed to show that she suffered from a medically determinable physical or mental impairment expected to last at least twelve months or result in death and that rendered her unable to engage in substantial gainful activity. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A). The ALJ reasoned that Drs. Jalil's and Desmonde's conclusions regarding Schmidt's work restrictions should not be given controlling or substantial weight based on the totality of the medical evidence. The ALJ also concluded that "the objective findings do not support the level of chronic pain asserted by the claimant." Finally, the ALJ relied heavily on the vocational expert's testimony

---

[3] The ALJ asked the vocational expert if it was correct that there were 5,000 additional cashier jobs available with a sedentary restriction versus a light-duty restriction, and the vocational expert testified that the numbers were correct.

to conclude that the Commissioner had demonstrated that Schmidt could perform numerous jobs despite her limitations. The ALJ thus denied Schmidt's applications at step five of the five-step sequential analysis. *See* 20 C.F.R. § 404.1520(a)(4)(I)-(iv); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) ("If the claimant makes it past step four, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy.").

Schmidt appealed to the Appeals Council, which denied her request for review. The Appeals Council's denial of review made the ALJ's decision the final decision of the Commissioner subject to judicial review. Schmidt then filed suit in the district court, which affirmed the ALJ's decision and subsequently denied her motion to alter or amend its judgment. Schmidt now appeals to this court.

II.

Where, as here, the Appeals Council has declined to review the ALJ's decision, the ALJ's decision constitutes the final decision of the Commissioner. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Thus, like the district court, we review the ALJ's decision. *White v. Sullivan*, 965 F.2d 133, 136 (7th Cir. 1992). When assessing the ALJ's decision, we review the ALJ's legal conclusions de novo. *Haynes*, 416 F.3d at 626. We deferentially review the ALJ's factual determinations, *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), and we will affirm the ALJ's decision if it is supported by substantial evidence in the record, *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *see also* 42 U.S.C. § 405(g). Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (quotation and citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "When reviewing for substantial evidence, we do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Id.* (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

   On appeal, Schmidt first argues that the ALJ should have given controlling weight to the opinions of Drs. Jalil and Desmonde and that the ALJ failed to explain adequately his refusal to credit their assessments. Normally, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "However, 'while the treating physician's opinion is important, it is not the final word on a claimant's disability.' " *Books*, 91 F.3d at 979 (quoting *Reynolds v. Bowen,* 844 F.2d 451, 455 (7th Cir. 1988)). As we previously have noted, " '[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.' " *Id.* (quoting *Stephens v. Heckler,* 766 F.2d 284 (7th Cir. 1985)). *See also Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (discussing the treating physician rule and stating that

while a treating physician has the advantage over other physicians whose reports might figure in a disability case because the treating physician has spent more time with the claimant, "the fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony, since, as is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits," and therefore "the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances" (internal citations omitted)). An ALJ thus may discount a treating physician's medical opinion if it the opinion "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503 (internal quotations and citations omitted).

In this case, the ALJ provided an adequate explanation of his decision not to give controlling weight to Dr. Jalil's and Dr. Desmonde's opinions. Regarding Dr. Jalil's December 2003 statement that Schmidt was incapable of performing even sedentary work, the ALJ found that diagnosis was not supported by the medical evidence in the record. For example, Dr. Jalil's February 2003 treatment notes indicate that Schmidt's physical examination was benign, and his June 2003 treatment notes indicate that he did not find anything significant despite Schmidt's complaints regarding numbness and tingling in her extremities. Further, despite Schmidt's complaints about pain, Dr. Jalil remarked on multiple occasions that her condition was "pretty good" and "very good." We agree with the ALJ that

these statements and others in Dr. Jalil's treatment notes
are inconsistent with Dr. Jalil's December 2003 conclusion
that Schmidt could not perform sedentary work. Further,
as the ALJ notes, Schmidt has failed to establish that
she suffers from her claimed level of chronic pain be-
cause her medical records indicate that she was able to
keep her pain in check using various medicines, and that
she did not follow through with her physical therapy or
pursue pain management. Finally, the "Functional Capac-
ity Questionnaire" on which Dr. Jalil stated that Schmidt
could not perform sedentary work is suspect because
Schmidt's attorney apparently drafted it and it did not
include any new medical evidence or any other basis to
justify these more extreme limitations. *See, e.g., Dixon*, 270
F.3d at 1177 (finding that the ALJ properly discounted
the opinion of treating physician who opined that his
patient was disabled merely "by writing 'yes' next to a
question that [the patient's] attorney had pre-typed [but]
did not elaborate on the basis of this opinion").

The evidence in Schmidt's medical records leads us to the
same conclusion regarding Dr. Desmonde's statement that
Schmidt "may have difficulty" tolerating the stress and
pressure of performing full-time work based on her mental
condition. The ALJ declined to give that statement con-
trolling weight because it appeared to be out of sync
with both Dr. Desmonde's other observations in his
treatment records, as well as those of Schmidt's therapist,
Sirek. Dr. Desmonde evaluated Schmidt on two occasions,
and concluded that she was capable of doing daily activi-
ties, that she was outgoing, friendly, and cooperative, as
well as free from hallucinations, delusions, obsessive
thoughts, paranoid, suicidal or homicidal ideation, or
symptoms of anxiety or panic. He also noted that Schmidt

had intact memory and above-average concentration, her judgment and insight were not impaired, and she demonstrated no evidence of a personality disorder. Dr. Desmonde consistently diagnosed Schmidt's functioning range as mild to moderate, and remarked that the symptoms of Schmidt's depression were "well regulated on her Zoloft." Additionally, before Schmidt voluntarily withdrew from therapy, Sirek observed in January 2003 that Schmidt was "very positive" and that she "looks very good today," and in April 2003 Schmidt told her that "for the most part . . . things have been going quite well." Finally, the ALJ noted that two state agency psychologists reviewed Schmidt's medical records in July 2002 and January 2003, and concluded that Schmidt did not have any significant work-related limitations cause by a mental impairment. We thus find that the ALJ's decision not to accord controlling weight to Dr. Jalil's and Dr. Desmonde's opinions was reasonable and that the ALJ sufficiently articulated the reasons for his decision.

Schmidt next argues the ALJ failed to provide specific reasons for his finding that Schmidt's allegations regarding her limitations were not fully credible and that the ALJ failed to follow Social Security Ruling 96-7p, which governs the assessment of an applicant's credibility. "Because the ALJ is in the best position to observe witnesses, we will not disturb [his] credibility determinations as long as they find some support in the record." *Dixon*, 270 F.3d at 1178-79. Accordingly, " '[w]e will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong.' " *Jens*, 347 F.3d at 213 (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (internal quotations and citations omitted)).

Here, contrary to Schmidt's assertions, the ALJ specifically stated in his opinion that he considered Schmidt's

testimony and the entire records under Social Security
Ruling 96-7p and 20 C.F.R. § 404.1529. The ALJ then
summarized Schmidt's testimony, in particular her asser-
tions of pain and the limitations she claimed as a result of
her impairments. After discussing Schmidt's testimony and
the medical evidence in the record, the ALJ stated that
Schmidt's "allegations of disabling pain and incapacitat-
ing limitations [were] not consistent with or supported by
the objective medical record of treating and examining
physicians," in addition to reiterating that "the objective
findings do not support the level of chronic pain asserted
by [Schmidt]." These conclusions were supported by
evidence in the medical record indicating that Schmidt
regularly exhibited normal neurological findings,
strength, reflexes, and sensation. In short, the diagnostic
evidence in Schmidt's medical records conflicts with
testimony and claims of disabling pain. Further,
Schmidt's medical history indicates that she voluntarily
discontinued physical therapy and declined to pursue
pain management, both of which cast doubt on the
severity of Schmidt's pain and her need to alleviate it. The
ALJ also noted that while Schmidt claimed in her brief that
her daily activities were "minimal," the record indicated
that she engaged in significant daily activities, including
working part-time as a bookkeeper, attending college
classes, spending time with her granddaughter,
babysitting, performing household chores, preparing
meals, taking vacations, socializing with family and
friends, driving, and reading. Finally, the ALJ did not
totally discount Schmidt's testimony regarding how her
pain affected her ability to perform certain activities, as
evinced by the ALJ's decision to limit Schmidt's range of
work to sedentary when assessing her residual functional
capacity. Accordingly, we find that the ALJ provided

sufficient reasons for his finding that Schmidt's allega-
tions regarding her limitations were not fully credible,
and we will not disturb those findings.

Schmidt further argues that the ALJ erred in assessing
her physical and mental impairments in calculating her
residual functional capacity, and thus the ALJ's questions
to the vocational expert based on those determinations, as
well and the vocational expert's responses, were flawed.
Schmidt first argues that the ALJ inadequately determined
her mental impairments because he skipped from the
"special technique" used to rate the degree of limitation
caused by her mental impairments, *see* 20 C.F.R.
§ 404.1520a,[4] to a mental residual functional capacity
without any explanation of how he reached his conclu-
sions. Contrary to Schmidt's assertions, the ALJ did
evaluate Schmidt's mental limitations under the "para-
graph B" criteria in his opinion, and he incorporated those
assessments into his determination of Schmidt's mental
residual functional capacity. Finding that Schmidt had
only mild limitations in daily activities and social func-
tioning, and no episodes of decompensation, the ALJ
concluded that Schmidt did not have any further work-

---

[4] The "special technique" assists an adjudicator in evaluating
the severity of a claimant's mental impairments. 20 C.F.R.
§ 404.1520a. The adjudicator evaluates the level of severity of a
claimant's mental impairment at steps two and three of the
sequential evaluation by rating the claimant's limitations and
restrictions in four areas: (1) activities of daily living; (2) social
functioning; (3) concentration, persistence or pace; and (4)
episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). These
four functional areas correspond to the requirements of
"paragraph B" of the Agency's mental impairment listings. 20
C.F.R. part 404, subpart P, appendix 1, § 12.00 et seq.

related limitations due to her mental impairments. With
the exception of the above discussed statement by Dr.
Desmonde that Schmidt "may have difficulty tolerating
the stress and pressure of full time, competitive employ-
ment" based on her mental condition, the ALJ's mental
findings nearly mirror Dr. Desmonde's findings in his
treatment notes. The ALJ also limited Schmidt's work to
jobs not involving high production goals, thus giving
some credibility to Schmidt's stress claims. We therefore
find substantial evidence supporting the ALJ's deter-
mination of Schmidt's mental residual functional capacity.

Schmidt next attacks the ALJ's assessment of her physical
impairments and subsequent determination of her physical
residual functional capacity. First, Schmidt argues that
the ALJ's analysis was deficient because he did not
specify the frequency with which she would need to
alternate between sitting and standing. We find Schmidt's
contention unavailing, however, because the ALJ did
restrict Schmidt to work that allowed her an opportunity
to sit or stand at her "own option." Further, the limita-
tion that the ALJ imposed was consistent with Schmidt's
testimony that she could not sit or stand for long periods,
and Dr. Jalil's opinion that Schmidt needed to change
positions at her "own option." Second, Schmidt contends
that she suffered from greater manipulative limitations
than those that the ALJ imposed. We also find this argu-
ment unpersuasive because there was no basis in Schmidt's
medical records, including those of Dr. Jalil and the state
agency reviewers, indicating that she needed greater
manipulative restrictions. The ALJ also sufficiently at-
tempted to accommodate Schmidt's complaints of numb-
ness and pain in her upper extremities by including a
limitation of no power gripping. Third, Schmidt asserts

that the ALJ failed to credit Dr. Nees' and Dr. Thomas'
statements that she should be limited to part-time work.
Unfortunately for Schmidt, she had already proffered
Dr. Nees' and Dr. Thomas' opinions to support an earlier
disability claim, and the ALJ in that case explicitly rejected
them to the extent that they indicated that Schmidt was
capable of performing only part-time work after February
1, 1999. Schmidt elected not to appeal that decision, thus
that opinion stands as the final decision on her disability
through the date of the decision, May 8, 2000. *See* 20 C.F.R.
§ 404.988. Earlier evidence, such as previous physicians'
opinions, can be considered relevant when adjudicating
subsequent applications for benefits, *see Groves v. Apfel*, 148
F.3d 809, 810-11 (7th Cir. 1998), and the ALJ acknowledged
as much when he mentioned his consideration of Dr. Nees'
opinion. However, as he did with Dr. Jalil's opinion, the
ALJ found that Dr. Nees' opinion and Dr. Thomas' opinion
did not deserve controlling weight, and the record as a
whole did not support a finding that Schmidt was limited
to part-time work. Likewise, based on our review of the
record, we find the ALJ's determination supported by
substantial evidence. Fourth, Schmidt argues that the ALJ
erred by failing to adopt her residual functional capacity
as determined by any of her physicians. As we have
stated previously, an ALJ must consider the entire record,
but the ALJ is not required to rely entirely on a particular
physician's opinion or choose between the opinions any
of the claimant's physicians. *See Diaz v. Chater*, 55 F.3d
300, 306 n.2 (7th Cir. 1995). Here, that is exactly what the
ALJ did in weighing all of Schmidt's physicians' opinions
along with her testimony and the other record evidence. In
sum, we find that the ALJ's determination of Schmidt's
physical limitations and conclusion that she was capable

of full-time, sedentary work was supported by substantial evidence.

Finally, having determined that substantial evidence supports the ALJ's determination of Schmidt's mental and physical limitations and resulting residual functional capacity, we examine the ALJ's conclusion that Schmidt was not disabled because she could perform a significant number of jobs. We reject Schmidt's contention that the ALJ should have included additional mental and physical limitations in his questioning of the vocational expert, because the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible. *See Ehrhart v. Sec'y Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). Here, the ALJ posed appropriate hypothetical questions to the vocational expert based on his determination of Schmidt's residual functional capacity, and the vocational expert testified that Schmidt could perform a significant number of jobs. Accordingly, we find that substantial evidence supports the ALJ's conclusion that Schmidt's applications failed at step five of the five-step sequential analysis.

### III.

We find that the ALJ's denial of Schmidt's applications for DIB and SSI benefits is supported by substantial evidence, and therefore we AFFIRM the Commissioner's decision.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*